J-S22029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| C.M.J., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| N.L.J., | |
| Appellant | No. 1742 WDA 2014 |

Appeal from the Order entered September 24, 2014,
in the Court of Common Pleas of Venango County,
Civil Division, at No(s): 17-2014

BEFORE:  PANELLA, LAZARUS, and STRASSBURGER*, JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED JUNE 03, 2015**

N.L.J. (Mother) appeals from the order entered September 24, 2014, in the Court of Common Pleas of Venango County, which awarded primary physical custody and shared legal custody of the parties' minor son, K.M.J. (Child), to C.M.J. (Father).  We affirm.

Some background about the parties to the instant appeal is necessary. The certified record reveals the following facts. Mother is originally from New Jersey and moved to Western Pennsylvania to attend college. Mother and Father met and began dating while Mother attended Clarion University. They never married, although they did cohabitate.  Child was born in February of 2013.

_____

* Retired Senior Judge specially assigned to the Superior Court.

Prior to and after Child's birth, the relationship of the parties was tumultuous and, occasionally, violent. The couple's issues primarily focused on finances. Although Mother informed her extended family (residing in New Jersey) that she was frequently abused by Father, no police record of those assaults exists.

Both parties have sporadic work histories; Mother's due to her college schedule and criminal convictions and Father's due, in part, to his mild seizure disorder, a consequence of which is his self-imposed abstention from driving a vehicle.[1]

In November of 2013, Mother was incarcerated as part of a sentence imposed following a 2011 conviction for driving under the influence of alcohol (DUI). During her 45-day period of incarceration, Father exercised sole custody of Child. Mother was released on or about December 30, 2013, and returned to the parties' home. A few days later, in January of 2014, Mother reported Father to Venango County Children and Youth Services (CYS), alleging that Father had abused and neglected Child while Mother was incarcerated. These allegations stemmed from information provided to Mother by Maternal Grandmother, who had communicated with Father

---

[1] At the time of the custody hearing, Mother was on parole and participating in a work ready program with the Venango County Assistance Office and Father was working at a Kwik-fill station near his parents' home.

electronically via Skype[2] during Mother's incarceration and suspected Father had neglected Child.[3]  Although the allegations of abuse were ultimately unfounded, Mother's report to CYS prompted Father to leave the couple's home and move in with his parents in Mercer County, 45 minutes away.

On January 8, 2014, Father filed a complaint for custody, in which he requested primary physical and legal custody of Child.  A custody trial was held on July 7, 2014, and July 9, 2014. On September 24, 2014, the trial court entered its order awarding Father primary physical custody, awarding Mother partial physical custody every other weekend from 7:00 p.m. on Friday until 7:00 p.m. on Sunday, and awarding both parents shared legal custody.[4]  Mother timely filed a notice of appeal.  However, Mother failed to file concomitantly a concise statement of errors complained of on appeal

---

[2] Skype is a free internet-based program that allows individuals to video conference from a home computer.

[3] Specifically, Maternal Grandmother contended that Father had confined Child alone for long periods of time in a cold, empty room using baby gates and a comforter to block doorways.  N.T., 7/7/2014, at 54, 57-58. Additionally, Maternal Grandmother claimed that Child was violent and animalistic while Mother was away. *Id.* at 53-57.

[4] On October 1, 2014, Mother filed a motion to vacate opinion and order, in which she indicated that the subject order would need to be distributed to third parties, and that the opinion portion of the order will "unnecessarily demean [Mother]'s character."  Motion to Vacate Opinion and Order, 10/1/2014, at 1 (unnumbered pages).  As a result, the trial court issued a truncated version of its order on October 16, 2014, which did not include the opinion portion.

pursuant to Pa.R.A.P. 1925(a)(2)(i). On October 22, 2014, the trial court ordered Mother to file a concise statement, and Mother timely complied.[5]

Mother now raises the following issues for our review.

1. Did the [trial c]ourt err in that the record will not support the court's conclusions in the sixteen (16) factors as required by 23 Pa. C.S.[] §[]5328?

2. Did the [trial c]ourt err in balancing the sixteen (16) factors in determining the best interest of the child that [Father] have primary custody of the child?

Mother's Brief at 14.[6]

We address Mother's claims mindful of our well-settled standard of review.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's

---

[5] Father has not objected or claimed any prejudice as a result of Mother's failure to file a concise statement until ordered to do so by the trial court. Thus, we have accepted Mother's statement in reliance on our decision in *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that a mother's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party). *Cf. J.P. v. S.P.*, 991 A.2d 904, 908 (Pa. Super. 2010) (stating that an appellant waived her issues on appeal when she failed to file a concise statement with her notice of appeal, and then also failed to comply with the trial court's order to file concise statement within 21 days).

[6] We note that Mother has not divided her argument into as many parts as there are questions to be argued, in violation of Pa.R.A.P. 2119(a). However, we decline to quash as this error does not prevent us from reviewing her claims.

deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396 (Pa. Super. 2014) (citation omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a).

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Instantly, in its September 24, 2014 Findings and Order, the trial court analyzed each of the factors listed *supra*, and concluded that all of the relevant factors weighed in favor of Father, while none of the factors

weighed in the favor of Mother.[7]  We address each of Mother's arguments with respect to the trial court's conclusions in turn.

With respect to Sections 5328(a)(1), (8), and (13), Mother contends that the trial court erred by finding that Father is more likely than Mother to encourage and permit frequent and continuing contact between the child and the other parent, that the trial court erred by concluding that Mother "would attempt to turn the child against [Father] if she had any significant periods of custody," and that the trial court erred by concluding that "'[Father] has made attempts to cooperate and work with [Mother] despite the level of conflict that exists.'"  Mother's Brief at 18-19, 22-23, 26-27.  Mother asserts that the court's findings are not supported by the evidence.  *Id.* at 19, 22-23.  Mother contends that Father is uncooperative and refuses to communicate with her, and that Father's mother (Paternal Grandmother) is hostile toward her and has threatened to kill her.  *Id.* at 19, 23, 26. Mother cites as proof of Father's unwillingness to cooperate in co-parenting Child (1) the emergency petition for special relief she filed on May 14, 2014 after Father refused her permission to take Child to New Jersey over a weekend in June to attend a family wedding because the proposed visit fell during a

---

[7] Effective January 1, 2014, the Child Custody Act was amended to include Section 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services).  The trial court did not specifically consider Section 5328(a)(2.1) in its Findings and Order. However, the court considered the involvement of child protective services in this matter while addressing Section 5328(a)(15).  Findings and Order, 9/24/2014, at 8.

period of his designated custodial time, and (2) the petition for contempt filed against Father in December of 2014, months after the custody trial took place, in which she alleged Father denied her telephone access to Child on six separate occasions. *Id.* at 18, 26-27.[8]

After reviewing the record in this matter, we conclude that the trial court's findings are supported by the evidence. During the custody trial, Father testified that Mother has threatened to move back to her home state of New Jersey and take Child with her. N.T., 7/7/2014, at 102. Father further testified that this was why he opposed Mother's taking Child to New Jersey to attend the wedding. *Id.* at 155. Paternal Grandmother corroborated Father's testimony that Mother has threatened to not let Father see Child anymore. *Id.* at 28 ("[Father] was told she hoped he enjoyed seeing [Child] because it was going to be the last time …."). Paternal Grandmother testified that Mother does not make these threats during every weekly custody exchange, "but it has been getting worse." *Id.* Father and his mother noted that Mother is sometimes hostile toward Father during custody exchanges. *Id.* at 28-29, 102.

Notably, the trial court also heard testimony that Mother does not allow Father to have access to Child while Child is at daycare , nor did she list Father as an emergency contact at the daycare. N.T., 7/9/2014, at 61-62. Instead, she listed Maternal Grandmother, who resides in New Jersey.

---

[8] Although he was ordered to communicate with Mother daily, Father was not held in contempt of the existing custody order. Trial Court Order, 2/5/2014.

N.T., 7/9/2014, at 61-63. Moreover, as discussed in greater detail *infra*, the court found that Mother has made false claims of abuse against her by Father. Based on the foregoing, it was reasonable for the court to conclude that Mother is unlikely to foster a relationship between Father and Child, and that Mother will try to alienate Child from Father if given the opportunity. No relief is due.

With respect to Section 5328(a)(2), Mother argues that the trial court erred by finding that Father had not physically abused her. Mother's Brief at 19-21. Mother emphasizes the testimony of her mother and brother, as well as her own testimony, that abuse had occurred. *Id.* at 20, 28-29.[9]

Again, our review of the record reveals that Mother is not entitled to relief. Father repeatedly denied that he had abused Mother, and instead testified that Mother would become physically aggressive toward him, and that he called the police approximately nine times due to Mother's physical aggression. N.T., 7/7/2014, at 112-13, 129. Father's claims were corroborated by the former neighbor of Father and Mother, R.W., who testified that she observed Mother throw part of "one of those little grills" at Father, but that she never observed Father attack Mother. *Id.* at 78. While

_____

[9] Maternal Grandmother and Mother's Brother did not witness the abuse first hand, but testified that Mother told them Father had caused her bruising and injuries. N.T., 7/7/2014, at 62-68, 75. According to Maternal Grandmother, she confronted Father about the abuse over Skype while Mother was incarcerated, at which time Father admitted to "going too far" and apologized. *Id.* at 71. Father denied this conversation occurred. *Id,.* at 112-113.

Mother and her family members claimed that Father committed acts of abuse against Mother, the trial court was free to reject this testimony as incredible, and we discern no abuse of discretion.[10]

With respect to Sections 5328(4), (9), and (12), Mother contends that the trial court erred by finding that Father "would be best suited for stability," and that Father is more likely to maintain a maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. Mother's Brief at 21-23. Mother contends that the court erred by concluding that Mother had left Child in the care of possibly dangerous individuals, when in fact it was Father who had done so. *Id.* at 21, 25-26. Mother also insists that she is a loving and attentive parent, and that Father is financially irresponsible. *Id.* at 21-23.

We conclude that there was ample testimony presented during the hearing to support the trial court's conclusion that Father is more stable than Mother. Father testified that he requested primary custody of Child because

_____

[10] In its Findings and Order, the trial court explained that some of Mother's abuse accusations "seemed extremely farfetched to the significant injuries she claimed to have suffered without medical treatment." Findings and Order, 9/24/2014, at 4. It appears that the court was referring to the testimony of Mother's mother, who stated that Father took Mother's hand "and bent back until all the bones snapped and her hand was broken." N.T., 7/7/2014, at 64. According to mother's Mother, the police "saw it broken and swollen and everything," but did nothing to assist Mother because "Oil City police did not like getting involved in domestic abuse." *Id.* at 65. Reportedly, Mother did not seek medical treatment for this injury, because she was afraid of Father. *Id.* at 66. In Mother's account of this incident, she stated that Father "[s]queezed my hand and just rolled it and my one pinky bone snapped out …." N.T., 7/9/2014, at 26.

"I can give him more stability." N.T., 7/7/2014, at 94. He explained that Mother engages in aggressive behaviors, such as "yelling, screaming, [and] hitting," and that "I just don't want my kid around that." *Id.* While he admits that he and Mother were evicted from their first apartment for failure to pay rent, Father testified that he now works regular hours and lives with his parents, who assist him by caring for Child while he is at work. *Id.* at 24, 89.

By contrast, Mother has an erratic employment history. She testified that she recently lost her job, and that she has signed up to do "community service … for cash assistance" through the "[w]ork ready program with the county assistance office." *Id.* at 5, 16; N.T., 7/9/2014, at 7. As discussed above, Mother's criminal history plays a role in her inability to hold certain jobs. N.T., 7/7/2014, at 13. However, the work ready program does provide Mother with discounted daycare for Child. Nonetheless, we discern no error in the trial court's assessment that this factor weighs in favor of Father.

Admittedly, Mother is correct that there was little, if any, evidence presented during the custody trial that she has left Child in the care of potentially dangerous individuals.[11] Moreover, Mother expressed concern during the trial that Father left Child in the care of a coworker whose last name he did not know, and that Father had left Child in the care of a man

---

[11] There was testimony that Mother sometimes left Child in the care of a man named D.S., also known as "Bear." N.T., 7/7/2014, at 16, 84-85; N.T., 7/9/2014, at 43. No explanation was given as to why this man was an inappropriate influence on Child.

with a dog which, according to Mother, previously had attacked a child. N.T., 7/9/2014, at 34. However, it does not appear that the court's concern with Mother's childcare choices played a critical role in its decision, and we discern no basis upon which to reverse the court's order.

With respect to Section 5328(a)(5), the record reveals that father's extended family is local to the Mercer/Venango County area, while Mother's family continue to reside in New Jersey or Eastern Pennsylvania. With respect to her extended family, Mother testified that once a year would be "sufficient" for Child to visit New Jersey. However, Mother also testified that her family had limited contact with Child, due to limtiations "set by [Father] and the [Paternal Grandmother]." Mother's Brief at 22. On this point, Mother emphasizes the testimony of Maternal Grandmother, who stated that Father at one point allowed communication between Child and Maternal Grandmother via Skype, but that after "only a couple of times … [Father] no longer agreed to this form of communication …." *Id.* This account is disputed by Father who testified that he accommodated Maternal Grandmother's requests to Skype with Child "[m]aybe half dozen, dozen times" during Mother's incarceration, and that he never refused to Skype with Maternal Grandmother when asked to do so. N.T., 7/7/2014, at 109-11, 130-31. Again, the trial court was free to credit this testimony. No relief is due.

With respect to Sections 5328(a)(14), Mother argues that the trial court erred by finding that she is in denial of her substance abuse issues.

- 12 -

Mother's Brief at 27. Mother notes that she "offered into evidence … the Venango County Substance Abuse Program, Substance Abuse Treatment Recommendation," which "declares no treatment indicated for [Mother] …." *Id.*

Contrary to the claim in Mother's Brief, it does not appear that a "Substance Abuse Treatment Recommendation" ever was offered as an exhibit or entered into evidence at the custody trial.[12] The trial court cannot be faulted for failing to credit a piece of evidence that was not before it. Moreover, even if this recommendation had been presented to the court, it was not unreasonable for the court to conclude that Mother was being less than forthright about her issues with substance abuse, as Mother's testimony with regard to her prior DUI charge in New York was both evasive and confusing.[13] For example, Mother initially testified that her only criminal conviction was for a 2010 DUI in Pennsylvania. N.T., 7/7/2014, at 11. Then she testified that she was convicted of disorderly conduct in New York in 2003. *Id.* Then Mother admitted that her 2010 DUI "was a second offense DUI." *Id.* However, she denied that she was convicted of her first DUI charges in New York, and stated that the charges appeared "[o]n my driving

---

[12] Mother did testify that she underwent a substance abuse assessment in 2010, and that no treatment was recommended, but no exhibit was offered to corroborate this testimony. N.T., 7/9/2014, at 28.

[13] As the trial court pointed out in its 1925(a) opinion, it was "very familiar" with Mother's criminal history, having handled her guilty plea and subsequent appeal. Trial Court Opinion, 11/20/2014, at 2.

record but not my criminal record." ***Id.*** Mother then stated that "[t]here's nothing on a criminal record in New York that has my name on it," right before she again indicated that she had been convicted of disorderly conduct in New York. ***Id.*** at 12. We see no reason to reverse the trial court's order.

With respect to Sections 5328(a)(10), (15), and (16), Mother contends that "absolutely no testimony or evidence exists to support the court's claim that [Mother] suffers from 'some type of mental illness.'" Mother's Brief at 23, 29-30. Mother also insists that the court acted unreasonably by expressing concern with regard to some of her parenting decisions. ***Id.*** at 23-25, 28. Further, Mother asserts that she is "far more educated" than Father, that Father has failed to take an active role in Child's education, and that Father has a history of leaving Child "segregated and trapped within a playpen in a room that was very cold." ***Id.*** at 24-25, 30. She argues that the court acted unreasonably by not addressing Father's epilepsy. ***Id.*** at 28.

Continuously, the court emphasized that, "throughout the custody trial, [Mother] exhibited clear signs of some type of mental disturbance, significant enough that it caused great concern to this court in [Mother] exercising any type of significant custodial time with the minor child." Findings and Order, 9/24/2014, at 5, 8, 11; ***see also*** Trial Court Opinion, 11/20/2014, at 2-3 ("Above all other factors to consider on this custody [case], this [c]ourt specifically believes [Mother] has a very significant mental health issue which would affect her ability to competently parent this child."). In its findings and order, as well as its 1925(a) opinion, the court

- 14 -

explained its conclusion concerning Mother's mental health by emphasizing, *inter alia*, that Mother's testimony was rambling and confused, and that Mother at one point forgot what question she was answering.[14]  Findings and Order, 9/24/2014, at 7; Trial Court Opinion, 11/20/2014, at 2-3.  The record amply supports the trial court's findings.  For example, during Mother's testimony, she was asked about her trip to New Jersey with Child, mentioned *supra*.  Mother answered these questions as follows.

> Q. When you wanted to go to this event, what was the significance of it in your mind?
>
> A. I wouldn't take [Child] down to New Jersey because his skull doesn't fuse together until after one year so I waited until after----
>
> > [Father's counsel]: Wait a minute, I didn't hear that answer.
>
> A. His skull doesn't fuse together until after one year.
>
> > [Mother's counsel]: Skull.
>
> > [Father's counsel]: Skull, thank you.
>
> Q. From a family perspective, was there some significance?
>
> A. (No response.)

---

[14] The trial court also expressed concern relative to Mother's false claims of abuse by Father, and Mother's belief that children should not ride in cars until they are a year old because their skulls have not fully been formed. Findings and Order, 9/24/2014, at 7-8.  The court further noted that Mother refused to admit that she had a prior DUI conviction in New York, "contrary to what this [c]ourt is familiar with" from sentencing Mother for her more recent DUI, and that Mother "was so emphatic over this that this [c]ourt determined that it was a fixed false belief, which by definition is a delusion." Trial Court Opinion, 11/20/2014, at 2.

Q. Was this occasion the first occasion, only occasion, to be able to meet some of these relatives, his extended family, that's my question?

A. This was the only occasion I was willing--- this wasn't the first occasion that [Child] had met his relatives, the majority of us live on the East side of the United States. Some of them had come to visit me on the Western side of Pennsylvania, but I don't like having [Child] in the car. I was in a bad accident and it makes me nervous and like I said his skull needed to be fused together, so I wouldn't---I don't like having [Child] in the car.

N.T., 7/9/2014, at 13-14.

Shortly after this exchange, Mother provided a similarly disconnected series of responses with regard to her level of cooperation with Father, and with regard to Child's daycare.

Q. If [Father] would call you and say, hey our family's doing this or doing that, we need a little extra time, would you be willing to give him extra time for those kinds of family things?

A. I would love---I come from a family where I knew my great grandmother, so I know that family is very important and I actually chose the name, the middle name for [Child] myself to be [M.], because um, [Father] doesn't know his father, he's only met him one other time, his real dad, an[d] [Father] was raised with his grandparents. The grandfather's name is [M.] and I thought that that was an incredible deed that he did to help his daughter raise her first child out of wedlock. To honor that, I had named [Child], [K.M.] and then [J.], after his adopted father.

Q. Alright. The um---we talked just briefly before about your routine and whatnot. [Child's] at [Child Development Center], which one?

A. Oil City.

Q. Okay, and um, do you have interaction with the staff there; do you talk to the staff?

- 16 -

A. Yes.

Q. How often and what's your take on how he's doing and how they're doing I suppose?

A. Every time I drop [Child] off, I sit there for approximately fifteen minutes and some of the kids call me mom and um, I volunteer to help out there if they need some help.

*Id.* at 15-16.

Most notably, Mother was asked about Father's participation in caring for Child during the time they were living together. This resulted in the following exchange.

Q. … There was somewhat of an upsetting incident with regard to whenever you gave birth to [Child] at the hospital, was [Father] there?

A. [Father] was there actually. We were getting into arguments over the money and I kept telling him, um, me and [Father] got into a fight and I went home with bruises on me while I was pregnant and I kept thinking about how I wanted my son to know who his dad was. So I went home---

Q. Whenever you say "home" where do you mean?

A. Back to my apartment in Oil City where I left [Father]. And um----I forgot what we were talking about.

Q. Well really, my question was going to be focused on when you gave birth---

A. OH!!! OH!!

Q. ---was [F]ather at the hospital?

A. So that night [Father], he just wasn't paying the rent and I said to him [Father]---and he was coming home late, drunk, four o'clock in the morning. He said he worked at McDonald's, I said they close at twelve. He said he was there and they made him

scrub the oil off the floor, but then the one time he came home with this 18 year old kid drunk and I kicked the kid out of the house and I said I'm not putting up with this. One time I---

[Father's counsel]: Can we have a timeframe please?

A. I'm not done, I'm talking about my---

[Father's counsel]: Yeah, I hear ya, but I'm asking your attorney for a timeframe.

Q. [Mother], that's a fair question on his part because you didn't exactly answer my question, "b", you didn't put this in perspective of when was this, was this after---

A. Oh, so me and [Father] were in a fight---

Q. No, no, was this after [Child] was born?

A. [Father] left the hospital room the night [Child] was born with his parents. He didn't come home till the next day or come back down to the hospital until the next day, the next night.

*Id.* at 24-25.

Finally, when discussing an incident in which Mother reported Father to CYS after Child had fallen down a stairs and injured himself while in Father's care, Mother argued with Father's counsel that the definition of "blunt head injury" was "somebody struck [Child] on the head with a blunt object." *Id.* at 48-51. Mother claimed repeatedly that this definition of Child's injury was contained in the doctor's report. *Id.* at 48-49. ("That's what the doctor said, that's not what I said, I have a medical report that says that."). When asked to identify the relevant portion of the report, Mother was unable to do so. *Id.* at 50. Mother then adamantly denied saying that the doctor had written "the definition of a blunt head injury" in the report. *Id.*

Given this testimony, it was reasonable for the trial court to be concerned with Mother's mental health. Additionally, we emphasize that this Court must show great deference to the factual findings and credibility determinations of the trial court, which had the benefit of viewing Mother's testimony firsthand. *See Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)) ("[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect …. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.").

Further, with regard to Mother's allegation that Father left Child isolated in a cold room, Father testified that he created a "playroom" for Child during the time Mother was incarcerated. N.T., 7/7/2014, at 103-05. Father explained that he closed off the room using baby gates and a playpen, and placed safety plugs in the outlets, so that Child "can run around there and there's nothing he can knock over, nothing he can fall. There's only a table there with his toys … so I could run around [and] cook dinner, straighten up another room, do whatever." *Id.* at 104-05. Father denied that he left Child alone for long periods of time, and stated that "[if] he's entertained and playing then he'd play, if he started fussing then I'd come see him. If I was doing something that's why I made the playroom so I could watch him, because all the rooms are connected." *Id.* at 105. As

before, the trial court was free to accept Father's testimony, and we discern no abuse of discretion.

Finally, we note that Father's medical condition also does not warrant reversing the trial court's order and granting primary physical to Mother. Father testified that he suffered a serious head injury when he was "about 16 or so," and that he now experiences "seizure events" when exposed to pulsing lights. *Id.* at 114-16, 134. Father explained that, as a result, he does not drive a car and instead rides his bicycle to work each day. *Id.* at 117. Father admitted that he last saw a doctor about his condition "[f]ive or six maybe" years ago, that he does not take medication for it, and that he has no safety plan in place in the event he were to experience a seizure while Child is in his care. *Id.* at 116, 134-35. However, Father was clear that his condition is brought on only by pulsing light, and that "I just don't go near strobe lights, that's the solution." *Id.* at 135. It was reasonable for the court to conclude that Father's condition does not pose a serious safety risk to Child.

For all of the foregoing reasons, we discern no error in the trial court's determination that the relevant custody factors weighed predominantly in favor of Father. Accordingly, because we conclude that none of Mother's claims entitles her to relief, we affirm the order of the trial court.

Order affirmed.


Judgment Entered.

- 20 -

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/3/2015